UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

<u>United States of America</u>,
        Government

        v.                          Criminal No. 08-cr-85-1-2-SM
                                    Opinion No. 2009 DNH 063

<u>Phillip Rawnsley and</u>
<u>Justin Reynolds</u>,
        Defendants

## <u>O R D E R</u>

Defendants move to suppress evidence obtained during an investigative stop and subsequent frisk for weapons.  A firearm was taken from each defendant.  Defendant Rawnsley also moves to suppress incriminatory statements he subsequently made during two custodial interrogation sessions.  An evidentiary hearing was held and the court later orally ordered the firearms suppressed, but otherwise denied the motions, reserving the option of providing a written decision should the need arise.

The government pointed out that the court did not address the government's alternative argument in opposition to Defendant Rawnsley's motion to suppress the firearm taken from him — that the frisk of Rawnsley stood on different grounds than the frisk of Reynolds, since it occurred after a firearm was found on Reynolds.  The court took that issue under advisement.  For the reasons given below, evidence of the firearm taken from Reynolds

is suppressed.   Rawnsley's motion to suppress evidence of the
firearm taken from him, and the statements he made to police
during two custodial interrogation sessions (with some caveats),
is denied.


### Background

On December 29, 2007, sometime after 8 p.m., New Hampshire
State Trooper David Kane came upon what appeared to be a minor
one-car accident near the Bedford Mall and Route 3 in Bedford,
New Hampshire.   A white Econoline van was some 15 to 20 feet off
the roadway and lodged in a snowbank.   No one was at the scene,
and the trooper noticed that a single set of footprints lead away
from the van, down an embankment and toward Carrabba's
restaurant, located some distance away at 2 Upjohn Street (and in
the general parking lot area of the Bedford Mall).   The trooper
checked the vehicle's registration and obtained a very basic
physical description of the owner (height six feet, weight 180
pounds, hair brown and eyes brown).   He also found that the
registered owner had a prior conviction for Driving While Under
the Influence (DWI) "or something similar to that" on his record.
Suspecting the driver might have committed the offense of leaving
the scene of an accident, or even DWI, he called for assistance.

Shortly thereafter, Trooper Aaron Eder-Linell arrived with his K-9 partner, Kody.  Kody followed the tracks and led the troopers across Route 3 to Carrabba's restaurant.  The troopers went inside and asked the hostess if anyone fitting the registered owner's general description had come in.  She reported that a disheveled-looking man generally fitting the description given had come into the restaurant about 45 minutes earlier and had asked to use the telephone.  After making a call, he left.

The troopers and Kody went outside to look around the area for the suspect, thinking he might still be in the area waiting for a ride.  By that time, it was approximately 9 p.m.  After they walked around the building, the troopers noticed what they took to be employees of the restaurant on a break.  They also saw two men, later identified as Defendants Rawnsley and Reynolds, about 50 yards away, walking on Upjohn Street.  Upjohn Street is a public way adjacent to the mall parking lot.  Trooper Kane testified that the area was well-lighted — the parking lot lights were on — "it was fairly well-lit in that dark corner." (Testimony of Trooper Kane, March 3, 2009.)  No evidence was presented to suggest that the locale qualified as a "high-crime" area.  The two men were walking toward Route 3 (where the van was located), on a course that would converge with the troopers.

3

The troopers thought it unusual for pedestrians to be walking on Upjohn Street in the evening, as no establishments (but the restaurant) were open in that general vicinity. The nearest buildings housed a daycare center and a bank. The men were wearing hooded sweatshirts. The troopers were in full uniform and had Kody on a leash.[1]

The troopers suspected the two men might be connected in some way with the accident under investigation, one perhaps being the driver and the other a friend called to provide a ride, or to assist in extracting the van from the snowbank.

The troopers observed that the two men saw them, made eye contact, and then abruptly turned around and began walking in the opposite direction, at a quickened pace. Trooper Eder-Linell immediately shouted at them: "State Police, stop!" Instead of stopping, the two men quickened their pace even more. The

---

[1]   The government says in its brief that Kody "led the Troopers around to the southern side of the restaurant where both Troopers noticed two individuals with hooded sweatshirts walking west along Upjohn Street toward Route 3," but in fact Kody was not tracking and was not leading the Troopers around the building and I reject the government's implicit contention that Kody somehow was suggesting that the two individuals had some connection to the footprints or scent Kody was tracking earlier. If that had been the case, his handler would have so testified, and the prosecutor would certainly have brought that fact out at the evidentiary hearing. Trooper Eder-Linell made no such claim during his testimony.

4

troopers thought they were about to run, and Trooper Eder-Linell again shouted at them: "Police, stop!"  The two men stopped after the second command was shouted, and the troopers and Kody approached them.

The troopers asked the men for identification and also asked what they were doing in the area.  Although seemingly hesitant, Reynolds produced identification, while Rawnsley said he had none, but gave his name and date of birth.  Trooper Kane focused on Rawnsley while Trooper Eder-Linell focused on Reynolds.  The troopers consciously moved the two men apart, to keep them out of earshot of each other, to obtain independent answers to the questions being posed.  The two men were not "overly nervous," but were being "kind of evasive . . . they were acting funny. . . not wanting to spend too much time with us."  (Testimony of Trooper Kane, March 3, 2009.)

When asked why they were in the area, Reynolds told Trooper Eder-Linell that Rawnsley's girlfriend had dropped them off and they were going to the Bedford mall to see a movie.  The troopers found that explanation implausible, because the men had been walking away from the movie theater, and the theater in the mall had been closed for several months, which closing had been noticed on a large billboard at the mall.  Under further

5

questioning, Rawnsley told Trooper Kane that he had had an

argument with his girlfriend and that she had dropped him and

Reynolds off.  He said he had called her to come back and pick

them up.  (Before stopping the two men, the troopers had noticed

a female driving a car with a loud muffler, alone, in the parking

lot of Carrabba's restaurant.)

 

    Trooper Eder-Linell questioned Reynolds.  His testimony

differed from Trooper Kane's in some respects: he claimed it was

"dark, [with] very little street light or anything like that in

the area."  (Testimony of Trooper Eder-Linell, March 3, 2009.)

He also said Reynolds did not, at least initially, give his name

or provide identification.  I find that the scene was not "dark,"

but was well-lit by the parking lot and street lights, and that

Reynolds did provide his name and identification, primarily based

on Trooper Kane's testimony, but also based upon Trooper Eder-

Linell's demeanor and manner while testifying.  Eder-Linell

seemed to have only a loose grasp of the order of events, and

generally gave the impression that his memory was not as clear as

Trooper Kane's with regard to details.  I also infer that the

names and identification given by the defendants were not

consistent with the name of the registered owner of the white

van, and that the defendants' physical characteristics did not

match those of the registered owner.

6

While Trooper Eder-Linell was questioning Reynolds, Kody
nudged Reynolds' right front pocket with his nose and paw.
Because Kody was trained to detect drugs, Eder-Linell thought
Kody might have caught a scent coming from Reynolds' pocket.
Trooper Eder-Linell asked Reynolds if he had anything on him that
the trooper should know about.  Reynolds said he did not.
Trooper Eder-Linell then asked Reynolds for permission to search
him.  Reynolds declined, whereupon Eder-Linell immediately told
Reynolds that he was going to "pat him down for my safety."
(Testimony of Trooper Eder-Linell, March 3, 2009.)  When he
patted down Reynolds' right front pocket he felt something that
seemed to him to be a metal object, possibly a knife.  The
trooper asked Reynolds what was in his pocket and he responded
"stuff."  The trooper asked what kind of stuff, and Reynolds
responded "just stuff."  At that point Eder-Linell reached into
the pocket and pulled out a metal lighter and, along with it, a
plastic baggy containing some pills — the trooper said the baggy
came out unintentionally.  Reynolds was asked about the pills and
responded that they were prescription Ibuprofen.

Trooper Eder-Linell continued to frisk Reynolds and felt a
metal object around the bottom area of his right leg.  He shook
the pant leg and a pistol fell to the pavement.  At that point
Eder-Linell alerted Trooper Kane by shouting "gun" and told

7

Reynolds to get down on the ground, which he did.  Trooper Kane,
upon hearing the alert, physically put Rawnsley on the ground as
well and frisked him for weapons, finding a pistol in his
waistband.

Trooper Eder-Linell explained his reasons for patting down
Reynolds as:

> Q:  Are any issues of officer safety present in
>     your mind at this point?
>
> A:  Definitely, not knowing who they are, not
>     having a willingness on their part to
>     identify themselves.  The fact that they were
>     wearing kind of bulky clothing, you know,
>     with the hooded sweatshirts up, not being
>     able to see some of their movements, keeping
>     their hands, I repeatedly told them to keep
>     hands out of pocket where I can see them
>     because obviously it's just not having the
>     ability to see if they have any weapons or
>     anything like that on them at that point and
>     not being up front with information when
>     asked.

I find that in fact the defendants did identify themselves,
certainly by that point.  The clothing worn by defendants was
fairly described as "bulky" (but not unlike most outerwear
commonly seen in New Hampshire in December).  The troopers, of
course, could not see if weapons were underneath the clothing,
but could plainly see defendants' movements as they were in close
proximity and engaged one-on-one.  I also find that the

defendants were not (as implied by Trooper Eder-Linell) putting their hands in their pockets, or disobeying any commands to keep their hands out of their pockets, or putting their hands where they could not be observed.  Trooper Kane did not testify about any such behavior, and Trooper Eder-Linell did not testify that defendants actually engaged in such behavior.

## Discussion

Defendants argue that the investigative stop was unlawful at its inception, because the troopers did not have a reasonable, articulable suspicion that they were involved, or about to become involved, in any criminal activity.  See Terry v. Ohio, 392 U.S. 1 (1968).  Defendants also contend that, even if the initial stop was not unlawful, the pat/frisks were unlawful because the officers had no particularized reason to think that either defendant was armed or dangerous.  See United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004); United States v. Coplin, 463 F.3d 96, 100 (1st Cir. 2006); United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001).

"The oversight of brief investigatory stops has two aspects. First, a police officer must have a reasonable suspicion of an individual's involvement in some criminal activity in order to make the initial stop.  Second, actions undertaken pursuant to

that stop must be reasonably related in scope to the stop itself 'unless the police have a basis for expanding their investigation.'"  United States v. Ruidiaz, 529 F.3d 25, 28-29 (1st Cir. 2008) (citations omitted).  Reasonable suspicion requires more than a mere hunch, but less than probable cause. United States v. Sokolow, 490 U.S. 1, 7 (1989).  Determining reasonableness requires a practical, commonsense assessment that entails a measurable degree of deference to the perceptions of experienced law enforcement officers.  Ruidiaz, 529 F.3d at 29. Nevertheless, the government bears the burden of proving, by a preponderance of the evidence, that a police officer's actions were reasonable under the totality of the circumstances.

Assuming a valid investigative, or Terry, stop, a pat-frisk for weapons is permissible if the police officer "is justified in believing that the person is armed and dangerous to the officer or others."  United States v. McKoy, 428 F.3d 38, 39 (1st Cir. 2005)(citations omitted).  "It is insufficient that the stop itself is valid; there must be a separate analysis of whether the standard for pat-frisks has been met.  To assess the legality of a protective frisk, a court looks at the totality of the circumstances to see whether the officer had a particularized, objective basis for his or her suspicion."  Id. (citing United States v. Arvizu, 534 U.S. 266, 273 (2002)); see also United

10

States v. AM, ___ F.3d ___, 2009 WL1058617 (1st Cir. April 21, 2009).


The Terry Stop

It is doubtful that, when Trooper Eder-Linell first exerted his authority and shouted a command for the defendants to stop, the officers had a legitimate basis to conduct a brief investigative stop.  They were looking for a single driver involved in a minor one-car accident that occurred well beyond the vicinity of the restaurant and Upjohn Street.  The suspicion of crime, even the minor offense of leaving the scene of an accident, was weak — after all, the van was off a ramp in a busy highway area, and one can readily understand that a stranded driver might walk directly toward a place of business to make a call for help rather than stand on the ramp indefinitely on a cold December night.  Nevertheless, the troopers' speculation that a leaving the scene of an accident offense (or even DWI) might have occurred was not unreasonable.


The troopers dutifully sought to track any potential offender down with a trained canine, and found themselves at Carraba's restaurant, where the hostess confirmed that a disheveled man fitting the general description of the registered owner had come into the restaurant, made a call, and left, some

11

45 minutes earlier.  When the officers went outside to look for that person, and saw two men some 50 yards away walking on a public way in the general direction of the accident scene, they had no reason, beyond hunch, to think one might be connected to the accident, or that either was involved in any kind of criminal activity.  There were no furtive movements; the area was well-lighted; it was a parking lot serving a large mall, the roadway was adjacent to that lot; the area was not a "high-crime" area, there was no suspicious activity, and there was nothing about the two men that suggested that they were engaged in, or were about to engage in anything illegal, or that criminal activity was afoot.

The defendants had every right to turn around and walk away from the officers when they saw them.  The officers were in full state police uniform and were accompanied by a police dog, which, for many people, would constitute an intimidating circumstance, preferably avoided.  Had defendants stopped upon the first command, the legitimacy of the stop would be of doubtful legality.  But, defendants did not stop.  Instead, they ignored the trooper's command, quickened their pace, and appeared to be about to run.  When the second command was issued, they stopped, thereby submitting to the officers' authority.

Considering the totality of the circumstances, I find that an objectively reasonable police officer would have had a reasonable, articulable suspicion that the defendants were connected to or involved in the car accident under investigation when the second command was shouted.  The defendants were walking toward the general area of the accident, with no obvious alternative objective (there were no stores, houses, or other places in the immediate area to which they were likely walking).  One could reasonably conclude that the driver went to the restaurant, called for a ride, or assistance in extricating the van from the snowbank, and arranged to meet the person called in the mall parking lot.  Walking back to the scene from the mall parking lot would have been a reasonable strategy, given the ease of parking, the modest distance to the van from the parking lot, and the busy nature of the off-ramp, where an additional car would pose a genuine hazard if stopped on the ramp, or parked off-road.  When the defendants saw the troopers and turned to walk away, the troopers could reasonably assume that it was because defendants did not wish to speak to them because they, or one of them, had been the driver of the abandoned van.  The balance decidedly tipped, however, when the defendants refused to submit to the trooper's first invocation of his police authority — that is, when he shouted to them "State Police, Stop!"  By ignoring that command and quickening their pace in the opposite

13

direction, and behaving as if they were preparing to run, they effectively engaged in flight.

Under controlling Supreme Court precedent, the <u>Terry</u> stop occurred not when the trooper first commanded the defendants to stop, but after the second command, when they actually submitted to the trooper's authority by complying.  <u>California v. Hodari D.</u>, 499 U.S. 621 (1991).  By that point, the troopers reasonably could have suspected defendants, or one of them, of being involved in criminal activity — leaving the scene of the accident, and possibly DWI.  Defendants' obvious intent to flee from known police officers, who had commanded them to stop, constituted a sufficient added factor (consciousness of guilt) to support a reasonable suspicion that one of the men was the driver being sought, and that he was intent upon avoiding apprehension. <u>See, e.g.</u>, <u>United States v. Pope</u>, 561 F.2d 663 (6th Cir. 1977)(flight from clearly identified law enforcement officer may furnish sufficient grounds for limited investigative stop); <u>Illinois v. Wardlow</u>, 528 U.S. 119 (2000) (flight is not necessarily indicative of wrongdoing, but it is certainly suggestive of such).

Accordingly, the investigative stop was lawful at its inception.

14

The Pat-Frisk

The only reason for stopping the defendants (beyond mere
general curiosity — in the nature of a hunch — about their
appearance and presence on Upjohn Street), was their potential
connection to the van stuck in the snowbank some distance away on
the highway off-ramp, and the possibility that a DWI offense or
leaving the scene of an accident offense had occurred.  Neither
crime under investigation, however, was of the type that would
give rise to a justifiable suspicion that the detainees were
armed and dangerous.  That is, "[t]his is not a case where the
police had reason to suspect the presence of firearms based on
the type of crime suspected."  McKoy, 428 F.3d at 40 (quoting
United States v. Lott, 870 F.2d 778, 785 (1st Cir. 1989)).


Beyond that, the defendants gave no indication that they
might be armed and dangerous.  They were merely walking on a
public way and turned to avoid the police.  They were not in a
"high-crime" area; they engaged in no suspicious interactions
suggestive of drug-trading; there were no bulges in their
clothing that caused the officers to suspect weapons; the
defendants were cooperative and answered the questions put to
them (albeit not to the officer's satisfaction); they gave their
names, date of birth, and, in Reynolds' case, identification;
they were not overly nervous and gave no other indication of

15

dangerousness.  The area was well-lighted by the Bedford Mall parking and street lamps; defendants engaged in no furtive movements; and they did not try to put their hands in their pockets, or where they could not be seen.  Defendants were not belligerent, used no profanity, and offered no resistance of any kind.

As a general matter, officer safety is, rightly, an overriding and important concern from any police officer's perspective.  And, no doubt, the safest course for police officers would be to always pat-frisk every person an officer confronts at night, or during a traffic stop, or in a quiet or remote area, or, certainly, in a "high crime area."  That is not, however, a constitutionally permissible standard operating procedure.

Trooper Eder-Linell's testimony, and manner, clearly suggested that the pat-frisk of Reynolds was due less to an articulable concern for his own safety under the prevailing circumstances, or even a generalized concern, but, rather, was a direct response, to Reynolds' refusal to consent to a search of his person after Kody's behavior suggested the presence of drugs of some kind in Reynolds' pocket.  The pat-down was neither suggested by Trooper Eder-Linell, nor performed, until after Reynolds refused to consent to the requested search.  But at that

point, the facts warranting or not warranting a pat-frisk
remained unchanged, with the exception of Kody's signal.  And,
mere suspicion of drug possession, however, is generally
insufficient to suggest that the suspected possessor is armed and
dangerous.  See, e.g. Sibron v. New York, 392 U.S. 40 (1968);
Upshur v. United States, 716 A.2d 981 (D.C. 1998).  The Trooper's
testimony was, essentially, that a general interest in officer
safety motivated the pat-frisk rather than a justified
articulable suspicion that the detainee was armed and dangerous.

     The government failed to meet its burden to show that
Trooper Eder-Linell could have drawn an objectively reasonable
inference that Reynolds was armed and dangerous when he initiated
the pat-frisk.  Accordingly, evidence of the firearm seized
during that pat-frisk is suppressed.

     The pat-frisk of Rawnsley, however, stands on entirely
different footing.  Trooper Kane initiated the pat-frisk of
Rawnsley only after the firearm was discovered on Reynolds.  At
that point, having heard the alarm "gun," Trooper Kane had more
than ample information to infer that Rawnsley, too, might be
armed and, therefore, dangerous to him and Trooper Eder-Linell.
Rawnsley does not have standing to challenge the lawfulness of
Eder-Linell's pat frisk of Reynolds, and Rawnsley's

17

constitutional rights were not violated in any way.  Accordingly,
evidence of the firearm found on Rawnsley is not suppressed.


Rawnsley's Statements

Defendant Rawnsley also challenges the voluntariness of
incriminatory statements he made to police officers after his
arrest.  After his arrest, Rawnsley was subjected to custodial
interrogations on two occasions.  The first occurred on December
29 when state police Lieutenant Parenteau questioned him about
his activities that evening; the second occurred on December 30,
when local police officers questioned him about recent robberies
in Manchester and Allenstown.  Each time he was advised of his
Miranda[2]  rights, understood those rights, and waived those
rights both orally and in writing.  On each occasion, he
voluntarily answered questions put to him.  Rawnsley ended the
first interrogation when he told Lieutenant Parenteau he did not
wish to continue.

During the December 30th  interrogation, Rawnsley answered
questions voluntarily, with the exception of questions related to
drug activity and what other illegal activities he might have
engaged in to raise money (e.g., "What other things do you do?").

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

When Rawnsley refused to answer questions related to his revenue-raising actdivity, the police asked no further questions related to that topic and resumed questioning Rawnsley about the robberies under investigation.

I find that the government met its burden to establish that the challenged statements were voluntary.  First, I reject the defendant's principal claim that he was suffering from a disability (allegedly occasioned by drug withdrawal) to a degree sufficient to render his statements involuntary.  Nothing presented at the evidentiary hearing calls into serious question the voluntary character of those statements, or Rawnsley's understanding of and waiver of his rights.  And, with caveats discussed below, I find that Rawnsley was properly warned of his <u>Miranda</u> rights, and knowingly, intelligently and voluntarily waived those rights before answering questions.

Statements made by a defendant while in police custody can be admitted as evidence in a later criminal trial only if he or she was first warned, <u>inter</u> <u>alia</u>, of the right to remain silent, and that anything said can be used in a court of law.  <u>Miranda</u>, 384 U.S. at 479; <u>Dickerson v. United States</u>, 530 U.S. 428 (2000).  That right can be waived, but even if waived, it can be reasserted at any time during questioning.  Statements made while

19

in custody in the absence of <u>Miranda</u> warnings, or made after the
waived right is reasserted are inadmissable in evidence in a
subsequent prosecution.  <u>United States v. Palmer</u>, 203 F.3d 55, 60
(1st Cir. 2000); <u>United States v. Ortiz</u>, 177 F.3d 108, 109 (1st
Cir. 1999).

    Rawnsley argues that he invoked his right to silence during
the December 30th interrogation, after his initial waiver, but,
nevertheless, the local police officers continued to question
him.  That is so.  The audio recording of the interrogation
proves Rawnsley's point.  But, there is no issue, because the
government conceded that all responses given by Rawnsley after he
stated that he was through answering questions (at approximately
the 20 minute mark on the tape of the interview) constitute
inadmissible evidence, and will not be offered at trial by the
prosecution.  See Transcript, Hearing held on March 3, 2009, p.
139, l. 22-24.

    Rawnsley also says, in passing, that he invoked his right to
silence earlier in the interview as well, when he refused to
answer questions about drug dealing and other possibly unlawful
activity he engaged in to raise money.  It is clear from the
recorded interrogation, however, that Rawnsley invoked his right
to silence selectively — that his, he invoked his right to

20

silence with respect to further questioning about that activity, but not as to the topics at issue — the robberies under investigation.  He continued to answer those questions consistently with his earlier waiver, and did not indicate, at any time, even ambiguously, an intent to invoke his right to silence as to those topics.  See United States v. Eaton, 890 F.2d 511, 513 (1st Cir. 1989) (". . . a defendant may waive Miranda rights selectively, answering some questions but not others." (citations omitted).).

Finally, Rawnsley seeks to suppress his answers to preliminary questions asked before he was advised of, and waived, his Miranda rights.  Those questions, for the most part, fell comfortably within the bounds of the "booking exception" to the Miranda requirements (e.g., name, date of birth, social security number, address, and general identification information may be asked for without first providing Miranda warnings).  United States v. Doe, 878 F.2d 1546, 1551 (1st Cir. 1989); United States v. Reyes, 225 F.3d 71 (1st Cir. 2000).  As the court noted in Reyes, ". . . we think it would be a rare case indeed in which asking an individual his name, date of birth, and social security number would violate Miranda."  Id. at 77.

Questions do not, however, fall within the "booking exception," if, objectively, "the questions and circumstances

were such that the officer should reasonably have expected the question to elicit an incriminating response." Id., citing Doe, 878 F.2d at 1551.


Here, again, the government seems to take the position that it may seek to introduce Rawnsley's statements regarding his name, address, etc.  Why is not clear.  The preliminary questions asked by the local police, however, strayed beyond what can be regarded as routine identification matters, and included questions about Rawnsley's criminal record and his acquaintance with a co-conspirator (Michele Despres).  The government seemed to recognize that those answers (regarding past felony charges, and Rawnsley's association with Michele Despres) were in response to questions that a reasonable officer would have expected to elicit an incriminating response.  That is, Rawnsley is charged with being a felon in possession of a firearm (hence the relevance of his prior felony record), and conspiracy (with Despres) to commit robbery (hence the relevance of his association with her).  Because a review of the transcript leaves me unsure about the prosecution's intent - the prosecutor seemed to be saying that only Rawnsley's responses to identification questions would be offered, but then seemed to say he intended to offer responses related to his association with Despres as well - let me make it clear that Rawnsley's answers to questions related

22

to his identity and address will be admitted if offered, but answers given before he waived his <u>Miranda</u> rights regarding his criminal record, and relationship with Despres, and others, if offered, will not be admitted into evidence.

## Conclusion

With the exceptions noted above, Defendant Reynold's motion to suppress the firearm seized from him (document no. 23) is granted; Rawnsley's motion to suppress the firearm seized from him (document no. 17) is denied; and Rawnsley's motion to suppress statements made during the custodial interrogation on December 29 and 30 (document no. 17) are denied, with the caveats noted above.

**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

May 6, 2009

cc:  Kenneth L. Perkes, AUSA
     Bjorn R. Lange, Esq.
     James D. Gleason, Esq.
     U.S. Probation
     U.S. Marshal

23